# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2018-CA-00397-SCT

*CHARLES L. KUEBLER*

*v.*

*HINDS COUNTY SHERIFF, VICTOR MASON*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/20/2018 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| TRIAL COURT ATTORNEYS: | RONNIE MUSGROVE |
| | EDWARD BLACKMON |
| | THOMAS M. FORTNER |
| | CLAIRE BARKER |
| | KIMALON CAMPBELL |
| | GRETA HARRIS |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | RONNIE MUSGROVE |
| | MICHAEL S. SMITH, II |
| ATTORNEY FOR APPELLEE: | CLAIRE BARKER |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 06/27/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, C.J., ISHEE AND GRIFFIS, JJ.**

**GRIFFIS, JUSTICE, FOR THE COURT:**

¶1. Charles L. Kuebler appeals the denial of his petition for writ of habeas corpus. In his petition, Kuebler alleged that the employees of the Jackson Detention Center ("JDC") confiscated and photocopied his legal work, refused to let him meet with his attorneys, and eavesdropped on confidential attorney-client conversations. The circuit court found that Kuebler had not presented sufficient proof to support claims of violations of his constitutional rights and found no merit to the claims. After reviewing Kuebler's petition

and the evidence presented, we find that the circuit court did not err in denying the petition. We affirm.

**FACTS**

¶2.     In 2011, Kuebler was convicted of murder. His conviction was reversed and remanded for a new trial. *See* ***Kuebler v. State***, 204 So. 3d 1220 (Miss. 2016).

¶3.     Kuebler was then transferred to the JDC, where he has been held without bond awaiting retrial. He has actively participated in the preparation of his defense. His trial preparation included regular meetings with his attorneys and the creation of documents, which he contends contained confidential information and work-product information.

¶4.     Kuebler's problems with the JDC staff allegedly began on December 20, 2017, when JDC officers Lieutenant Gloria Petty and Sergeant Angela Robinson conducted a search of Kuebler's cell. As a result of the search, Lieutenant Petty and Sergeant Robinson found white-out, a spiral notebook, and an ink pen. Each of these items was considered contraband. They also found voluminous papers stored under the bed in three unauthorized laundry bags. The JDC Inmate Handbook allows inmates to keep legal papers in their cell, but it also states that the floor of an inmate's cell must be kept clear at all times, except for authorized items. Lieutenant Petty testified that the amount of papers in the cell created a fire hazard. Additionally, many of the documents had been stapled together, and staples were prohibited.

¶5.     Kuebler was not present for the search. When Kuebler returned to his cell, he claims that Lieutenant Petty and Sergeant Robinson removed or confiscated his legal papers,

2

including documents such as motions, hearing and trial transcripts, attorney-client correspondence, strategy documents, private investigator notes, and more. Lieutenant Petty instructed Kuebler to pack the majority of the papers into boxes, which would be stored in the property room, available for him to access on an item-by-item basis. The papers also were made available for Kuebler's attorneys to pick up at his request. Kuebler testified the conversation with Lieutenant Petty took place in a JDC office several hours after the papers were initially removed from his cell.

¶6.    Five boxes of legal papers were packed up by Kuebler and were placed in the property room. The boxes remained there for approximately twenty-four hours until they were picked up by Michael Smith, one of Kuebler's attorneys, on December 21, 2017. Smith inventoried the boxes and observed that staples had been removed from some, but not all, documents. There was testimony that the JDC staff did not read the documents, photocopy the documents, or discuss the contents of the boxes with anyone.

¶7.    Between December 2016 and January 2018, Kuebler's attorneys visited him approximately seventy-five times, according to Kuebler's attorney Thomas Fortner. On Sunday, December 24, 2017, Smith arrived at the JDC for a visit but was told that visits were not allowed that day and would resume on Wednesday, December 27, 2017. Smith returned on December 27, 2017, to visit Kuebler.

¶8.    Kuebler claims that his right to effective assistance of counsel was impeded. During regular business hours, the JDC allows attorney visits to be conducted on the second floor

of the JDC in private rooms. The rooms are monitored and secured from a central control room, referred to as the tower. After business hours, the second floor of the JDC is closed. and a room on the first floor of the JDC is available for attorneys to conduct inmate visits. The room on the first floor does not have a door; however, it is located down an empty hallway where staff traffic is light after hours. A guard is posted in the hallway to ensure security.

¶9.     During the December 27 inmate visit, Smith and Kuebler were allowed to meet in the first-floor room. Smith stated that the presence of a guard outside the room caused the meeting to be cut short due to their concern of a lack of privacy. According to Smith and Fortner, this had occurred before. On December 18, 2017, Kuebler met with Smith and Ronnie Musgrove. Also, on January 5, 2018, Kuebler met with Fortner.

¶10.    On January 4, 2018, Smith and Musgrove met with Kuebler in a second-floor private room, but they claim privacy concerns arose again when Deputy Rodrick Dillard positioned himself near the room's glass door. Kuebler testified that he had been to many attorney visits in this room and that this was the only time his deputy escort had remained by the visitation door. Normally, the visitation was monitored by the guard in the tower. Musgrove asked that they be given some privacy. However, Deputy Dillard, who was escorting an inmate to visitation for the first time that day, testified that he "was trained to stay right there in that immediate area" during visits and that he did not leave.

¶11.    Kuebler often brought papers to his attorney meetings. The JDC procedures allow

inmates to bring legal documents, but the inmate is searched before and after the attorney visit, and the documents are scanned to determine if they are legal in nature. Deputy Louis Fleming testified that "sometimes we're told that he can't take the legal work; sometimes he can." Deputy Jimmy Barnes testified that, on at least one occasion, Kuebler chose to leave his paperwork in his cell rather than allow Deputy Barnes to look at the documents.

¶12. Kuebler offered extensive testimony about harassment he alleged that he received from the JDC staff whenever he brought papers to his meetings. The parties agree that Kuebler was prevented from bringing his papers with him on two occasions. On January 5, 2018, a deputy conducted a routine patdown of Kuebler and discovered that he had folded-up papers in his possession. The papers were taken. Lieutenant Petty testified that inmates fold up papers in a similar fashion in order to pass letters. However, once the folded-up papers were determined to be legal papers, the papers were returned to Kuebler during his meeting. On February 5, 2018, another patdown was conducted, and the deputy discovered a yellow sticky note. Kuebler wanted the paper for his meeting, but sticky paper is contraband and was confiscated. Kuebler was not allowed to take the contraband paper to the meeting.

¶13. Neither Kuebler nor his attorneys ever filed a contemporaneous grievance or complaint to the circuit court or with counsel for the sheriff's office, who was responsible for the JDC. Kuebler said he was unable to access the JDC grievance procedure due to malfunctions with the computer system. Kuebler's attorneys offered no description of any failed efforts to make their concerns known in a contemporaneous manner.

¶14.     On January 12, 2018, Kuebler filed a petition for writ of habeas corpus. Kuebler alleged that his constitutional rights had been violated. The circuit judge held a hearing on February 9 and 16, 2018. Testimony was presented by eleven witnesses, including Kuebler. The circuit court found that Kuebler was allowed to meet with his attorneys at every request, that he never had access to his attorneys limited by the detention officers, that he did not present sufficient evidence of any violation of his constitutional rights, and that no evidence had been offered to prove he was being treated in a different manner than other inmates. The circuit court denied Kuebler's petition, and Kuebler now appeals.

**DISCUSSION**

¶15.     This Court has held that "[t]he rule is that the judgment of the trial court which heard the habeas corpus proceeding is presumptively correct, and, where the evidence is conflicting, the judge's finding of fact, if supported by the evidence, will not be disturbed on appeal." *Lee v. Hudson*, 165 Miss. 756, 144 So. 240, 240 (Miss. 1932). "[T]he judgment of a habeas corpus court will not be disturbed, unless it is manifest to us that the trial court either tried the cause upon an erroneous conception of the law, or that the judgment is erroneous upon the facts." *Parker v. Tullos*, 150 Miss. 680, 116 So. 531, 532 (Miss. 1928). We find that the circuit court neither "tried the cause upon an erroneous conception of the law" nor was the judgment erroneous upon the facts. *Id.*

¶16.     Kuebler argues that the JDC staff violated his Sixth Amendment and Fourteenth Amendment rights by denying him effective assistance of counsel and access to the courts.

6

He alleges that, on several occasions, the JDC staff eavesdropped on confidential conversations with his attorneys, provided attorney visitation rooms that did not have adequate privacy, refused his attorneys access to him, refused to allow him to bring legal paperwork to attorney visits, viewed his legal paperwork, confiscated his legal paperwork outside his presence, and withheld his mail. He presented no evidence that the allegations occurred but argues that the potential for wrongdoing was enough to create a violation.

¶17. The Sixth Amendment to the United States Constitution protects the right to effective assistance of counsel, a guarantee "that an accused shall enjoy the right 'to have the Assistance of Counsel for his defense.'" *United States v. Morrison*, 449 U.S. 361, 364, 101 S. Ct. 665, 66 L. Ed. 2d 564 (1981). The United States Court of Appeals for the Fifth Circuit has held that this right is implicated when there are concerns regarding interference with the attorney-client privilege. *Taylor v. Sterrett*, 532 F.2d 462, 472 (5th Cir. 1976). But when there is no "realistic possibility of injury to [the criminal defendant] or benefit to the State," the Supreme Court has held, "there can be no Sixth Amendment violation." *Weatherford v. Bursey*, 429 U.S. 545, 558, 97 S. Ct. 837, 51 L. Ed. 2d 30 (1977). The Fifth Circuit applied a similar principle to the seizure of documents protected by the attorney-client privilege; when those documents were not introduced at trial and no showing of prejudice was made, it found no violation of the Sixth Amendment. *United States v. Davis*, 226 F.3d 346, 353 (5th Cir. 2000). The federal courts have established that "[a]bsent some showing of prejudice, there could be no Sixth Amendment violation to be remedied." *Morrison*, 449

7

U.S. at 364.

¶18.    To allege a showing of prejudice, Kuebler asks that we assume, with no evidence, that the JDC staff members possess information obtained from listening to his conversations with his attorneys and reading his legal notes and that the JDC staff came into physical possession of his legal notes during the shakedown.  He then argues that, because the JDC staff members are employees of the state, any possession by the JDC staff members equates to possession by the prosecutorial team.  Kuebler mistakenly relies on *Blakeney v. State*, 236 So. 3d 11, 23 (Miss. 2017) ("Different agencies under the same government are considered the 'prosecution team.'" (quoting *Manning v. State*, 158 So. 3d 302, 306 (Miss. 2015))).

¶19.    In *Blakeney*, the prosecution failed to timely disclose to the defendant evidence that was in the possession of the sheriff's department.  *Id.*  The prosecution intended to introduce this evidence at trial and with due diligence could have disclosed it to the defendant earlier, since the evidence was in the possession of a government agency that was acting as part of the prosecution team.  *Id.*  The holding referred to the possession of evidence, not mere knowledge, in the context of the rules surrounding the disclosure of evidence.  *Id.* at 22-23. To apply it to Kuebler's case overextends the definition of "prosecution team."  There is no indication that the JDC staff served an investigative role or otherwise provided information to the prosecution.

¶20.    To the contrary, any knowledge that any JDC staff member gathered from observing Kuebler's meetings with his attorneys would not violate Kuebler's Sixth Amendment rights,

unless that knowledge was communicated. *Weatherford*, 429 U.S. at 556. There was no evidence that any JDC staff member provided any information to those involved in investigating or prosecuting this case. Kuebler's argument lacks merit.

¶21. Kuebler next argues that he was denied actual and constructive access to his attorney. The record clearly established that Kuebler had approximately seventy-five face-to-face visits with his attorneys. Kuebler claims that the substance of those visits was limited by the actions of the JDC staff, whose presence within alleged earshot forced Kuebler and his attorneys to cut short their meetings when they worried their meetings were not confidential. The presence of guards was necessary for security and did not interrupt Kuebler's right to contact visits with his attorneys. Instead, the record indicates, and the circuit court correctly found, that Kuebler had ample meaningful visitation with his attorneys.

¶22. Like the right to effective assistance of counsel, it is well established that detainees are guaranteed access to the courts via the Fourteenth Amendment. *See Bounds v. Smith*, 430 U.S. 817, 821, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977), *abrogated on other grounds by Lewis v. Casey*, 518 U.S. 343, 351, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996). Claims of denial of access to courts fall into two categories: "claims that systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time" or "specific cases that cannot now be tried (or tried with all material evidence), no matter what official action may be in the future." *Christopher v. Harbury*, 536 U.S. 403, 413, 122 S. Ct. 2179, 153 L. Ed. 2d 413 (2002) (footnote omitted). However, the Fifth Circuit has noted that

9

the right of access for detainees is not unlimited. *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997). Rather, it encompasses only a reasonably adequate opportunity to file non-frivolous legal claims challenging their convictions or conditions of confinement. *Lewis*, 518 U.S. at 351. A successful denial-of-access-to-the-courts claim in the Fifth Circuit must show actual injury in connection with an identifiable legal proceeding. *Id.* at 349-53.

¶23. Kuebler contends that the JDC staff kept him from bringing his legal papers to meetings with his attorneys, denied him his rights to counsel, and denied him access to the courts. While the testimony on this issue is contradictory, it evidences the competing interests of ensuring prison security and protecting the rights of prison inmates. It was in the interest of prison security that Kuebler's papers were removed when they were discovered folded up on his person, which gave his JDC staff escort reason to believe he was actively concealing papers. Indeed, Kuebler testified that he intended to hide the papers from the JDC staff, because he did not trust them not to read his legal notes. The JDC staff's duties included the responsibility to monitor inmate activities. Once JDC staff determined the papers were legal documents, they were immediately returned to Kuebler while he met with his attorney. It was also in the interest of prison security that Kuebler's notes on sticky paper were confiscated, not because of the subject material but because sticky paper was unauthorized.

¶24. Similarly, the JDC's interest in ensuring prison security must be balanced with Kuebler's right to confidential communications. Confidentiality regarding attorney-client

10

communications cannot be taken away, but that privacy must be balanced with proper security measures. It was a necessary function of the JDC staff to scan papers to determine they were of a legal nature. Kuebler was found with papers in suspicious or unauthorized forms, like the folded notes, the sticky paper, and the papers that were held together with contraband staples. The unfolding of the papers or the removal of the staples does not establish that his legal papers were read or photocopied, as Kuebler contends. Certainly, no evidence was presented that this information was provided to the prosecution team.

¶25. Kuebler relies on the Fifth Circuit's holding in *Sterrett* that exposing confidential information to any third party creates a fear that the information has been compromised. *Sterrett*, 532 F.2d at 476. However, such fear does not create a presumption that an inmate's constitutional rights have been violated.

¶26. No evidence was presented to show that eavesdropping did in fact take place or that the staff photocopied or removed Kuebler's documents. No showing has been made that the prosecution has come into possession of any illegally obtained information or that an actual injury to his defense has occurred. The circuit court correctly found that no evidence supported the theory that the JDC staff took improper action with the contents of Kuebler's legal files or any other information that might have been gathered in the course of employment.

¶27. The circuit court determined that the evidence presented did not support a finding that JDC staff communicated to the prosecutors any information regarding Kuebler they may have

11

obtained in the course of their employment. We agree and find no error in the circuit court's finding that Kuebler failed to establish a violation of his constitutional rights.

¶28. Finally, Kuebler alleges that pieces of his mail were withheld from him. The identified letters were written in Italian, and the JDC staff considered that suspicious. There was limited testimony regarding this issue, and neither Kuebler's petition nor the circuit court's finding specifically addressed it, but we address it now.

¶29. The censorship or withholding of an inmate's mail "must be accompanied by minimum procedural safeguards." *Procunier v. Martinez*, 416 U.S. 396, 417, 94 S. Ct. 1800, 40 L. Ed. 2d 224 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401, 413-14, 109 S. Ct. 1874, 104 L. Ed. 2d 459 (1989). Such safeguards could include that the "inmate be notified of the rejection of a letter written by or addressed to him, that the author of that letter be given a reasonable opportunity to protest that decision, and that complaints be referred to a prison official other than the person who originally disapproved the correspondence." *Id.* at 418-19. The Fifth Circuit has concluded that such censorship of mail "must pursue a substantial government interest to conform to constitutional standards." *Sterrett*, 532 F.2d at 469.

¶30. Kuebler argues that there was no substantial interest to justify the withholding of his mail, but Lieutenant Petty testified about their concern of suspicious and secretive behavior. The letter was in Italian, unusual for Kuebler's mail, and raised the suspicion that Kuebler was trying to conceal something. Lieutenant Petty indicated that she confiscates such

12

suspicious letters to deter communication about illegal misconduct. With no evidence that Lieutenant Petty improperly handled Kuebler's mail, we must assume that prison security satisfied a substantial government interest.

¶31. In addition, we find that each of these issues would have been best addressed by the circuit judge in a contemporaneous manner. Kuebler's concerns very well may have had some merit, but they do not rise to the level of constitutional violations that would require the relief requested.

## CONCLUSION

¶32. We find that the circuit court correctly found that Kuebler's constitutional rights have not been violated. As a result, neither bond nor dismissal is appropriate. We affirm the denial of Kuebler's petition for writ of habeas corpus.

¶33. **AFFIRMED.**

**RANDOLPH, C.J., COLEMAN, MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. KITCHENS, P.J., CONCURS IN RESULT ONLY WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J.**

**KITCHENS, PRESIDING JUSTICE, CONCURRING IN RESULT ONLY:**

¶34. I agree with the majority that the trial judge did not err in denying Kuebler's petition for a writ of *habeas corpus*. But I observe, with respect, that both the trial court and the majority stray beyond the boundaries of *habeas corpus*. Ultimately, Kuebler's petition boiled down to an application for bail, and *habeas corpus* is not the best vehicle for that. Kuebler did not petition to challenge the validity of his detention, which would have placed him

solidly within *habeas corpus* territory. Accordingly, I concur in result only.

¶35.    Kuebler's petition for a writ of *habeas corpus* cited Uniform Civil Rule of Circuit and County Court Practice 2.07A, alleging that Jackson Detention Center officers had violated his constitutional rights. In the end, the trial judge concluded that Kuebler had filed his *habeas* petition as a means by which the court could reconsider admitting him to bail:

> THE COURT: . . . What are you asking this court to do for the 50th time? What ruling do you want from this court, so I can go ahead and move on?
>
> [KUEBLER'S ATTORNEY]: I want you to order that he will be entitled to bail under [Rule 2.07A]9(a) because everything has been so compromised and the ability to prepare for trial –
>
> THE COURT: Bail fixes what has been compromised is that what you are telling this court?
> . . . .
>
> [KUEBLER'S ATTORNEY]: [I]f we have to continue to fight these fights either internally or back before the court, then we're not spending our time preparing for trial, which is what we have the right to do, but more importantly, what Mr. Kuebler has the right to expect us to do, and what we were hoping is that we at least would put us in the best position possible to get ready for the trial and be able to not have any more violations of Mr. Kuebler's constitutional rights. And it appears to me that that is the best possibility of the options that are there. If I honestly thought that there were other things that this court could do that would rectify I would ask for it, but I don't believe it is.
> . . . .
>
> THE COURT: All right. It's a little far fetched and I think I have enough information. We're getting a little far off of what we're here for. Before the court is a petition for a writ of habeas corpus. Certain allegations have been made by the defendant. . . . *the defendant is making a request for bail alleging that bail is possibly a remedy for some of the issues herein. The Court has previously considered bail in this case, and the court has denied bail in the past*. . . .

(Emphasis added.)

¶36. The judge denied Kuebler's petition for a writ of *habeas corpus* and did not revisit the question of bail. The trial court was correct. Kuebler had made no claim that he was being unlawfully detained, and his pleadings did not request a reconsideration of the court's denial of bail.

¶37. In his petition for a writ of *habeas corpus*, Kuebler made only passing reference to the subject of bail: "While Mr. Kuebler's attorneys have made several previous requests that a bond be set in this case in order for him to be released and thereby facilitate his ability to participate in the preparation of his defense, the Court has not agreed to do so." He made no mention of bail in his request for relief.

¶38. The right of *habeas corpus*, also known as "the great writ," is a constitutional privilege. Miss. Const. art. 3, § 21; *see also **Boumediene v. Bush***, 553 U.S. 723, 739, 128 S. Ct. 2229, 2244, 171 L. Ed. 2d 41 (2008) ("The Framers viewed freedom from unlawful restraint as a fundamental precept of liberty, and they understood the writ of habeas corpus as a vital instrument to secure that freedom."). A petition for "writ of habeas corpus shall extend to all cases of illegal confinement or detention by which any person is deprived of his liberty, or by which the rightful custody of any person is withheld from the person entitled thereto, except in [] cases expressly excepted." Miss. Code. Ann. § 11-43-1 (Rev. 2014). "The function of the habeas corpus court in Mississippi . . . is to release a prisoner who is being unlawfully held or to grant him a bail bond which he can make." ***Keller v. Romero***,

303 So. 2d 481, 482 (Miss. 1974); *Nelson v. Tullos*, 323 So. 2d 539, 542 (Miss. 1975) ("[H]abeas corpus has the principal function of testing the legality of a petitioner's detention prior to his conviction."). The court "shall inquire into the cause of imprisonment or detention, and shall either discharge, commit, admit to bail, or remand the prisoner, or award the custody to the party entitled thereto, as the law and the evidence shall require." Miss. Code Ann. § 11-43-33 (Rev. 2014). But a judge is not required to consider a *habeas* petition when it is misused. *See, e.g.*, *Keller*, 303 So. 2d at 483; *see also Johnson v. State*, 159 So. 3d 601, 604 (Miss. Ct. App. 2014) (footnote omitted) ("[T]he court may refuse to grant the writ if it is manifest from the showing made in the petition that the person is not entitled to any relief."). Since no allegation of wrongful detention appears in Kuebler's petition, the trial judge was under no obligation to issue the writ.

¶39.    Because Kuebler did not challenge the validity of his confinement in the first place, that failure was enough to warrant denial of Kuebler's requested *habeas* relief. *See Smith v. Banks*, 134 So. 3d 715, 720 (Miss. 2014) ("Smith's petition for habeas corpus failed to challenge the validity of his detention . . . ."); *Keller*, 303 So. 2d at 482 ("A habeas corpus writ cannot be used as a collateral method . . . ."). Although Kuebler did claim, and adduced evidence of, egregious misconduct on the part of his jailers, *habeas corpus* does not provide an appropriate mechanism for addressing such matters. Accordingly, I respectfully suggest that the analysis provided by the majority, while superfluous in this instance, nevertheless led to the right result, and in that result I concur.

        **KING, P.J., JOINS THIS OPINION.**